ACREE, JUDGE:
The main issue to be decided is whether the Oldham Family Court abused its discretion when it declined to set aside the parties' marital separation agreement as unconscionable. We affirm in part, reverse in part, and remand for additional proceedings as explained herein.
FACTS AND PROCEDURE
Clyde and Melissa Mays were married November 28, 1992. Three children were born of the marriage: Madison Mays, born July 30, 1995; Hayden Mays, born December 13, 2000; and Emerson Mays, born May 16, 2003. During the marriage, Clyde was a Lieutenant Colonel and a pilot in the United States Marine Corps. Melissa did not work outside the home. The parties and their children resided in North Carolina.
The parties separated on September 26, 2014. Madison was emancipated by that date.
On November 6, 2014, Clyde and Melissa entered into a twenty-five-page Separation Agreement and Property Settlement Agreement. Melissa's attorney drafted the document. Clyde was not represented by counsel.[1] The Separation Agreement provides for:
• Joint custody of the parties' minor children with Melissa being the primary residential parent and Clyde receiving reasonable parenting time at reasonable times with a default schedule of every other weekend.
*521 • Child support paid by Clyde to Melissa in the amount of $933.00 per minor child per month for a total of $1,866.00 per month. They agreed child support shall continue until each minor child turns 22 years of age. In the event a child chooses to attend college or trade school, Clyde's child support obligation would be reduced to $250.00 per month for that child until the child turns 22 years of age
• A monthly allowance of $200.00 paid directly by Clyde to the parties' emancipated child Madison while she is attending college.
• "Alimony" (maintenance) paid by Clyde to Melissa for eleven years. Clyde agreed to pay Melissa:
• $1,250.00 per month from July 1, 2015 to June 30, 2016;
• $2,000.00 per month from July 1, 2016 to June 30, 2017;
• $2,500.00 per month from July 1, 2017 and continuing for a period of 108 consecutive months.
• Clyde to be solely responsible for and pay 100% of all the children's uninsured medical, dental, orthodontic, optical, and other health-related expenses.
• Clyde to be solely responsible for and pay 100% of each child's college tuition, room, board, and books.[2]
• Clyde to provide health insurance for the children and pay all associated costs.
• Melissa to receive one-half of Clyde's military retirement pay.
• Melissa to have exclusive use of the marital residence until June 2015, and Clyde to be solely responsible for all the expenses related to that residence, including the mortgage of $1,500 per month.
• Clyde to pay 50% of the maintenance and repair costs and 100% of the insurance for Madison's vehicle.
• Melissa to claim the children as dependents on her federal and state income tax returns beginning in 2015 and continuing every year thereafter.
The Separation Agreement further provides it is to be comprehensive, interpreted by the laws of North Carolina, and no modification of the terms of the agreement shall be valid unless in writing and signed by both parties. Section 24 reiterates that the agreement was made "voluntarily, freely, and without coercion or duress."
After signing the Separation Agreement, Clyde retired from the military and obtained employment as a pilot with Delta Airlines in Kentucky. In March 2015, he moved to Rowan County, Kentucky. Clyde subsequently filed a dissolution action in Rowan Family Court. He also filed a complaint in North Carolina seeking to set aside the Separation Agreement.[3]
Melissa and the children moved to Oldham County, Kentucky, in July 2015. She filed a competing dissolution action in Oldham Family Court. That suit was not allowed to proceed, as Melissa failed to meet the six-month residency jurisdictional requirement.
*522 However, in December 2015, the Rowan Family Court transferred Clyde's dissolution action to Oldham Family Court.
Melissa then filed a motion to ratify the Separation Agreement. Clyde opposed the motion and requested the family court set aside the Separation Agreement as unconscionable. He also asked the family court to award the parties joint custody and reasonable parenting time. The family court held a hearing on April 11, 2016. Both Clyde and Melissa testified.
Clyde testified that at the time he signed the Separation Agreement he was a member of the military approaching retirement. He stated Melissa had threatened to go to his superiors with allegations of infidelity if he refused her demands, and he feared Melissa would ruin his career, interfering with his military retirement and endangering his civilian career. Clyde testified that Melissa has anger issues and would often lose her temper, which made him anxious. He also stated Melissa threatened to keep the children from him if he refused to sign.
Clyde explained that although he was involved in the drafting and negotiations process, he did not feel he had much authority to make changes to the agreement's language and any time he questioned proposed language, Melissa's requests for relief increased. Clyde stated he felt he had no way out, and he signed the Separation Agreement under Melissa's influence. However, he also admitted he signed because he wanted to get away from Melissa and to make it "go away."
Melissa countered Clyde's testimony. She testified she met with him to discuss the agreement's terms and communicated about the terms via email. Melissa stated Clyde was fully involved in the drafting process, and even met with an attorney. However, Clyde explained that he spoke with an attorney for at most five minutes and the attorney did not review the Separation Agreement. Melissa testified she did not force Clyde to sign the Separation Agreement, in no way influenced his decision to sign, and that they discussed the document being a full and final settlement of their rights.
The family court admitted into evidence an email sent from Clyde to Melissa on October 22, 2014. In the email, Clyde stated, "I read through the agreement last night. It was pretty much like you said and reflected what we talked about [.]" Clyde acknowledged he was agreeing to pay child support in the amount of $933 per month per minor child until each child reaches the age of 22. He also stated, "we agreed alimony would be paid for 11 years, half of our nearly 22-year marriage," and acknowledged the increasing pay scale.
Clyde testified at the hearing that the agreement changed substantially from that initial version and that the parties went through five drafts of the agreement. Ultimately, Clyde admitted he reviewed the final draft for approximately one hour, signed the Separation Agreement before a notary, filed the document with the register of deed's office in New Bern, North Carolina, and substantially performed the terms of the Separation Agreement ever since.
Clyde further testified that, at the time the Agreement was signed he received approximately $10,000.00 per month in income as a Lieutenant Colonel in the military. He retired from the military on July 1, 2015 (almost a year after signing the Separation Agreement) and began working for Delta Airlines. While on first year pay, Clyde testified his income, exclusive of his military retirement, decreased dramatically. He currently averages $6,047.00 per month from his employment as a commercial airline pilot. He also receives $1,249.36 per month in disability payment, and half *523 of his military retirement pay in the amount of $2,054.50 per month; the other half is paid to Melissa. In sum, Clyde's gross monthly income is approximately $9,350.86. Melissa confirmed she is unemployed and receives no income from outside employment.
The family court found Clyde's proof was insufficient to support a finding that the Separation Agreement was manifestly unreasonable and unfair, and therefore, unconscionable. It entered an order on May 25, 2016 granting Melissa's motion to ratify the Separation Agreement and denying Clyde's motion to set it aside or modify it with exception of custody and the parties' parenting time schedule.[4] The family court stated:
With regard to the conscionability of the Agreement, the Court finds that [Clyde] was not coerced or otherwise under the influence of [Melissa]. Whether [Melissa] threatened [Clyde's] career or not, [Clyde] clearly participated in the drafting process of the agreement and several of [Clyde's] notes were incorporated into the final agreement signed by both parties. Moreover, the parties clearly contemplated [Clyde's] employment with a commercial airline carrier at the time they signed the Agreement. The Court is not persuaded that the Agreement is now unconscionable due to any decreased income of [Clyde].
(R. 169).
Clyde then filed a post-judgment motion pursuant to CR [5] 52.04 requesting additional findings of fact related to maintenance, child support, and parenting time. Relevant to this appeal, Clyde asked the family court to apply KRS [6] 403.211 and KRS 402.200, and to make specific findings under each statute, to the Separation Agreement's provisions regarding child support and maintenance. The family court denied Clyde's motion.
Clyde then filed a subsequent motion asserting his maintenance obligation should be terminated in light of Melissa's decision to cohabitate, and that he should be permitted to deduct the maintenance paid from his income taxes. The family court again denied Clyde's motion. It then incorporated the Separation Agreement into the decree of dissolution dissolving the parties' marriage. This appeal followed.
ANALYSIS
Clyde contends the family court erred by failing to find: (a) that he entered into the Separation Agreement as a result of duress, fraud, and undue influence from Melissa; and (b) that the Separation Agreement is unconscionable. He also faults the family court for denying his motion to modify maintenance. We agree in part, and disagree in part.
"To promote amicable settlement of disputes between parties to a marriage attendant upon ... the dissolution of their marriage, the parties may enter into a written separation agreement containing provisions for maintenance of either of them, disposition of any property owned by either of them, and custody, support and visitation of their children." KRS 403.180(1). The statute requires the court to consider the conscionability of a separation agreement prior to incorporating it into the decree of dissolution. KRS 403.180(2) ; Peterson v. Peterson , 583 S.W.2d 707, 711 (Ky. App. 1979). If the family court finds the separation agreement not to be unconscionable, the agreement's terms shall generally be binding on the parties and the court. KRS 403.180(2).
*524 A separation agreement may be set aside as unconscionable if the family court determines that it is manifestly unfair or unreasonable. McGowan v. McGowan , 663 S.W.2d 219, 222 (Ky. App. 1983) (citations omitted). It may also "be set aside if it results from fraud, undue influence, or overreaching." Id. ; Money v. Money , 297 S.W.3d 69, 72 (Ky. App. 2009). The party challenging the agreement must carry a "definite and substantial" burden of proof. Peterson , 583 S.W.2d at 711 (citation omitted).
The family court is in the best position to weigh the evidence and determine if a separation agreement is unconscionable or if it resulted from duress, undue influence, or overreaching. Shraberg v. Shraberg, 939 S.W.2d 330, 333 (Ky. 1997). Regarding such determinations, we defer to the family court's broad discretion, and are prohibited from disturbing its decision absent an abuse of its discretion. See id. ; Peterson , 583 S.W.2d at 712.
A. Duress, Fraud, and Undue Influence
Clyde argues there is substantial evidence to support a finding that he entered into the Separation Agreement because of duress, fraud, and undue influence from Melissa. Perhaps this is true. Nevertheless, we are unable to conclude that the family court abused its discretion when it refused to set aside the Separation Agreement on these grounds.
To establish duress, there must be "an actual or threatened violation or restraint on a man's person, contrary to law, to compel him to enter into a contract or to discharge one." Boatwright v. Walker , 715 S.W.2d 237, 243 (Ky. App. 1986) (citation omitted). Fraud "consists in successful deception intentionally practiced to induce another to part with property or some legal right. In other words, there must be some material misrepresentation made with the knowledge that it was false and with the intent that it be acted upon." Id. (citations omitted). And, undue influence generally "must be of sufficient force to destroy the free agency of the grantor and to constrain him to do, against his will, that which he would otherwise have refused to do." Mays v. Porter , 398 S.W.3d 454, 458 (Ky. App. 2013) (citation omitted).
The family court concluded Clyde entered into the Separation Agreement of his own free will and under no duress or threat of harm. In so finding, the family court found largely unconvincing Clyde's testimony that Melissa threatened to inform his military superiors that he was having an affair, that Melissa acted irrationally and erratically during the crafting of the Separation Agreement, and that Melissa threatened to keep the parties' minor children from him if he refused to sign the agreement. Instead, the family court relied significantly on Melissa's testimony, which countered much of that offered by Clyde. This was entirely appropriate. The family court, in its capacity as the finder of fact, "is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses" and, in its discretion, "may choose to believe or disbelieve any part of" the testimony presented. Bailey v. Bailey , 231 S.W.3d 793, 796 (Ky. App. 2007).
Clyde admitted he was involved in the negotiations process, a process that spanned three weeks and resulted in five drafts of the agreement. He admitted he consulted very briefly with an attorney. Clyde testified he reviewed the agreement, signed it before a notary, and recorded it with the local register of deed's office. Clyde further testified at the hearing that he was under a tremendous amount of stress and wanted "everything to be over" and he "just wanted to make this go away." As Justice Cooper commented in his concurring opinion in Shraberg , supra , *525 it is "appropriate to inquire into the reason why the moving party entered into such an agreement in the first place." 939 S.W.2d at 334. Clyde's motives-that he wanted Melissa to "shut up" and go away-are clear.
It was Clyde's burden to convince the family court that the Separation Agreement was the product of duress, fraud, undue influence, or some combination thereof. We are unable to conclude that the evidence was so strong that a granting of Clyde's motion was compelled as a matter of law. The family court's decision does not constitute an abuse of discretion.
B. Unconscionable
Clyde next contends the Separation Agreement is unconscionable on several grounds and should be set aside. He argues the family court abused its discretion when it refused to do so. We again are not convinced.
Clyde first asserts the Separation Agreement's terms are so one-sided that the agreement's unfairness is apparent on its face. He points out the agreement includes a weighted maintenance award wherein the payments to Melissa increase, rather than decrease, over time. It also requires Clyde to pay Melissa half of his monthly military retirement, to pay the parties' adult child a monthly allowance, to cover all the children's uninsured medical, dental, and optical expenses, to pay 100% of the children's college costs, and to pay the children allowances while they are in school. It further includes a child support payment in excess of Kentucky's child support guidelines, and required Clyde to pay for the marital residence despite Melissa residing there.
This Court has acknowledged that proof that an agreement is "lopsided" and clearly detrimental to one party suggests that the agreement is unconscionable. Burke v. Sexton , 814 S.W.2d 290 (Ky. App. 1991). But the fact that a party, such as Clyde, may have made a bad bargain does not render an agreement unconscionable. Peterson , 583 S.W.2d at 712. Clyde was certainly the breadwinner during the marriage and makes sufficient income to cover the expenses agreed to in the Separation Agreement. While perhaps leaving him with little discretionary income at the moment,[7] complying with the Separation Agreement will not render Clyde destitute.
Clyde also asserts that the agreement is unconscionable because his income has reduced dramatically, rendering the agreement manifestly unfair. Clyde's testimony at the April 2016 hearing revealed he currently receives approximately $9,300.00 per month in income. This encompasses his income from Delta Airlines ($6,047.00), half of his military retirement income ($2,054.50), and his disability income ($1,249.36). Clyde testified at the time he signed the Separation Agreement, he earned a little over $10,000.00 in income. While Clyde's employment income certainly is less, his overall income is substantially the same now as it was when he entered into the Separation Agreement.
Clyde next faults the family court for failing to make certain findings related to child support and maintenance. He claims the family court was obligated to apply KRS 403.211 and KRS 403.200, respectively, to the agreement's child support and maintenance provisions in making its unconscionability determination. We disagree.
Whether child support contained in a separation or separation agreement comports with Kentucky's child support guidelines[8] is certainly a factor the *526 family court may consider in making its conscionability determination. But the mere fact that the agreed-upon child support exceeds the Guidelines does not automatically render a separation agreement unconscionable. Pursley v. Pursley , 144 S.W.3d 820, 824 (Ky. 2004). "The Guidelines, themselves, allow parents to agree to child support in excess of the Guidelines." Id. And, while a court may not independently award child support in excess of the Guidelines or a child's reasonable needs without sufficient justification, it may ratify a parent's decision to knowingly do so. Id. As our Supreme Court has said:
There is no public policy in this jurisdiction which prevents parents from being as generous to their children as they wish, and when parents are determining child support, as opposed to the court, parents may agree to child support obligations that exceed their legal obligations. In recognition of this aspect of settlement agreements, "[a] majority of jurisdictions allow the court to incorporate and enforce, as terms of the decree, agreement terms that the court would have no independent power to order."
Id. (internal footnote omitted). The child support offered in this case, while in excess of the guidelines, is not shocking to the conscious or outside Clyde's reasonable fiscal means. There is no meaningful dispute that Clyde was aware of the amount he was agreeing to at the time he signed the Separation Agreement.
Similarly, the family court is empowered to ratify and adopt an agreement setting forth maintenance which, on its face, appears excessive or unnecessary in light of the statutory guidelines. See KRS 403.200 (identifying standards for granting and calculating maintenance). We see nothing in our jurisprudence that requires a family court to consider the statutory factors when reviewing a maintenance provision contained in a separation agreement, though it is certainly permitted to use the statutory guidelines as a tool in measuring the conscionability of a maintenance obligation.
In this case, the evidence revealed Melissa had not worked outside the home for over twenty years. Much of her education and training was outdated and stale. Perhaps more importantly, Clyde knew he was agreeing to pay maintenance, knew he was agreeing to pay increasing maintenance, and knew he was agreeing to pay maintenance for eleven years. Clyde also knew at the time he signed the Separation Agreement that he would soon be retiring from the military and seeking civilian employment as a commercial airline pilot. Yet he agreed to the maintenance terms anyway.
The family court committed no error when it declined to consider and specifically apply the statutory factors related to child support ( KRS 403.211 ) and maintenance ( KRS 403.200 ) in determining whether the parties' Separation Agreement was unconscionable. On this issue, we also affirm.
C. Modification of Maintenance Award
Finally, Clyde argues the family court erred when it declined to modify the Separation Agreement's maintenance provision to terminate upon Melissa's cohabitation and to allow Clyde to deduct the maintenance paid. We agree, in part.
The family court faulted Clyde for not incorporating a termination upon cohabitation provision in the agreement. It ruled: "The Court has found the parties' separation agreement was fully contemplated by the parties, [Clyde] participated in the drafting, and the agreement itself was "exhaustive" as to the provisions made therein, including that of maintenance. Had the parties intended for maintenance to cease upon the cohabitation of [Melissa], this Court assumes, such a provision could and *527 would have been incorporated into the agreement." The family court is not incorrect. But the failure to include such a provision does not prohibit the family court from independently modifying a Separation Agreement's maintenance provision when justice so requires.
We are mindful the Separation Agreement contains "no modification" language related to the maintenance provision. But a closer examination of the agreement reveals it provides Clyde's "obligation to pay alimony shall be non-modifiable." In other words, the court could not do away with Clyde's obligation to pay maintenance, but this language does not prevent Clyde from seeking, and the family court from granting, a reduction in the amount of maintenance owed provided he demonstrates compliance with Kentucky's maintenance modification statute, KRS 403.250.
Second, the Separation Agreement states it is to be interpreted in accordance with the laws of North Carolina. North Carolina Statute 50-16.9 directs that, "[i]f a dependent spouse who is receiving ... alimony ... remarries or engages in cohabitation, the ... alimony shall terminate." (emphasis added). Again, while Clyde may be obligated to pay some maintenance under the terms of the Separation Agreement, interpreting that agreement in accordance with North Carolina law and applying KRS 403.250 leads us to conclude that Melissa's remarriage or cohabitation could constitute a material and substantial change in circumstances which may justify a reduction in the amount of maintenance owed.
We must also point out that the family court's original finding that the Separation Agreement is not unconscionable does not prevent it from subsequently modifying the agreement. "A separation agreement which was originally determined not to be unconscionable may later be modified if due to a change in circumstances the agreement has become unconscionable." Bailey , 231 S.W.3d at 796. The family court suggested in its order that it could not modify the Separation Agreement because it had previously found it not to be unconscionable. This is simply incorrect. See id. The original conscionability decision does not prevent later modification if a change in circumstances renders the agreement subsequently unconscionable. These are separate inquiries. See Daunhauer v. Daunhauer , 295 S.W.3d 154, 157 (Ky. App. 2009) ("The changed circumstances requirement incorporates an unconscionability test, but there is no need to prove unfairness in the agreement's making. Instead, the party seeking modification must show that circumstances have altered so that in the current situation it would be manifestly unfair to require continued payment." (citation omitted)).
In this case, KRS 403.250 entitles Clyde to have his maintenance payment reduced if he demonstrates changed circumstances, such as Melissa's cohabitation, that renders unconscionable his obligation to pay the full maintenance amount set forth in the Separation Agreement. We reach this conclusion keeping in mind the underlying purpose of maintenance-rehabilitation. Maintenance seeks to enable the unemployable spouse to acquire the skills necessary to support himself or herself in the current workforce so that he or she does not rely upon the maintenance of the working spouse indefinitely. Gripshover v. Gripshover , 246 S.W.3d 460, 469 (Ky. 2008). The goal of a maintenance award is to facilitate one's transition from dependence upon her former spouse to independence. This is consistent with another goal of the dissolution process which is to sever all ties as much as possible as soon as possible. Light v. Light , 599 S.W.2d 476, 479 (Ky. App. 1980) ("Since ongoing maintenance ties the parties together, it should be avoided except as circumstances of need and fairness demand."). Melissa is sufficiently *528 young and educated to achieve financial self-support. The probability of Melissa's rehabilitation is high.
The other facet of Clyde's argument is that the family court erred when it denied his request to deduct his maintenance payments for tax consequences. The family court viewed Clyde's request as one to modify the parties' agreement, which it felt it lacked the authority to do. Again, we disagree. The Separation Agreement itself is silent on this issue. The family court had sufficient authority to grant Clyde's request. Nothing in the Separation Agreement or our jurisprudence requires otherwise. And as the family court itself pointed out, "Typically, alimony payments are deductible to the payor spouse and are income to the recipient if they are periodic payments, in discharge of a legal obligation, and imposed by a written divorce decree or separation agreement." (R. 255).
The other basis for the family court's denial was its finding that a handwritten and signed statement by Clyde stating he agreed "not to claim alimony payments to Melissa B. Mays as deductions on my income taxes beginning with tax year 2015," to be a valid addendum to the Separation Agreement. But the Separation Agreement specifically states that "no modification or waiver of any of the terms of this agreement shall be valid unless in writing and signed by both parties." (R. 90). This "addendum" fails to comply with Separation Agreement's plain language. It is not a barrier to allowing Clyde to deduct his maintenance payments to Melissa.
In sum, we find the family court erred when it denied Clyde's motion to modify the Separation Agreement's maintenance provision upon Melissa's cohabitation, if that fact is proven to the family court's satisfaction, and erred in concluding it lacked the authority to allow Clyde to deduct his maintenance payments for tax consequences. On these issues, we reverse and remand for further consideration by the family court. The family court shall determine on remand if Melissa is indeed cohabitating and, if so, if that constitutes sufficient grounds to modify the parties' maintenance provision and the scope of any such modification. It shall further order that Clyde is permitted to deduct any maintenance paid for tax purposes.
CONCLUSION
We affirm the Oldham Family Court's May 25, 2016 and June 9, 2016 orders denying Clyde's motions to set aside the Separation Agreement as unconscionable. We reverse the family court's August 19, 2016 order denying his motion to modify the maintenance provision upon Melissa's cohabitation and denying Clyde's request to deduct any maintenance paid for tax purposes. On these issues we remand for further proceedings as discussed above.
ALL CONCUR.

The agreement included a provision specifically reiterating that Clyde "has not in any way engaged the services of [an] attorney, and further has not been represented in any capacity by [an] attorney."

The agreement clarifies that Clyde's "obligation to pay [college] expenses shall not exceed the then costs equivalent to the child's attendance at a North Carolina state-supported college."

At no point did the parties file a dissolution action in North Carolina due to its one-year separation requirement. See North Carolina Statute (N.C. St.) 50-6 ("Marriages may be dissolved and the parties thereto divorced from the bonds of matrimony on the application of either party, if and when the husband and wife have lived separate and apart for one year, and the plaintiff or defendant in the suit for divorce has resided in the State for a period of six months.").

Additional evidence was received as to custody and parenting time, but these issues are not before us so we have omitted discussion of that evidence.

Kentucky Rules of Civil Procedure.

Kentucky Revised Statutes.

Clyde testified his income with Delta Airlines will steadily increase each year.

See KRS 403.212.